**Ronald MOBLEY, father and next friend of Joshua Mobley, Petitioner,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 90–17V.**

United States Claims Court.

Jan. 18, 1991.

---

Michael R. Hugo, Boston, Mass., for petitioner. Schlichtmann, Conway, Crowley & Hugo, of counsel.

David L. Terzian, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent. Helene M. Goldberg, Director, John Lodge Euler, Deputy Director, and Frank F. Krider, of counsel.

## OPINION

FUTEY, Judge.

This matter is before the court on petitioner's motion for review of the special master's decision. In his decision, the special master found that there was not a preponderance of evidence that petitioner suffered an encephalopathy within 3 days after his vaccination, or that the vaccination otherwise caused periventricular leukomalacia (PVL), and denied petitioner's request for compensation under the National Childhood Vaccine Injury Act of 1986, *as amended,* 42 U.S.C. § 300aa–1 *et seq.* (West Supp.1990) (Vaccine Act). Petitioner contends that the special master's decision "reaches an incorrect conclusion as a result of arbitrary and capricious findings which are only supported by a misreading of the record, and then only if certain testimony is taken out of context." Respondent maintains that the special master's decision was rationally based and supported by the record and should, therefore, be affirmed. For the reasons stated below, the court sustains the decision of the special master and denies petitioner's request for compensation.

### Factual Background

Joshua Mobley (Joshua), born December 7, 1981, received three administrations of diphtheria, pertussis, and tetanus (DPT) and oral polio vaccines in Tampa, Florida. On December 15, 1981, prior to his first vaccination, Joshua was taken to a doctor for a routine visit. The treating physician, Dr. Lipschutz, noted in his record that Joshua's weight and head size remained unchanged since birth. On February 9, 1982, Dr. Lipschutz again examined Joshua, noting that the child was gassy and fussy, and had problems with Similac. Dr. Lipschutz thereupon changed Joshua's formula to Isomil. In addition, Dr. Lipschutz measured Joshua's head size to be 38.1 cm, which is .4 cm below the 38.5 cm mean for a 2–month old boy. During this visit, Dr. Lipschutz administered the first DPT and oral polio vaccine doses to Joshua. At that time, Joshua was beginning to respond to environmental stimuli, following objects

with his eyes and looking in the direction of sounds. Joshua was also able to roll over from his stomach to his back while lying in bed.

After the first vaccination, Joshua developed a fever. This was followed by persistent screaming and uncontrollable crying over a 2–day period. Other than this inconsolable crying and screaming, Mrs. Mobley did not notice any immediate behavioral changes in Joshua. In early March, Joshua began to experience choking while feeding. Mrs. Mobley also noted that Joshua stopped grasping for toys and no longer shifted his head from side to side while lying on his stomach.[1]

On April 28, 1982, Joshua received his second dose of DPT and oral polio vaccine. Dr. Lipschutz did not record any feeding problems, but indicated in his notes that Joshua "doesn't roll over but has [normal neurological] exam."[2] During this visit, Joshua's head size was measured at 40 cm, below the 42 cm mean for a boy his age. After his second vaccination, Joshua cried and screamed inconsolably for approximately 2 days.

During the ensuing months, Joshua's muscles began to tighten. Joshua was seen by a chiropractor in early June, who described the child's condition as "limbs stiff, face expressionless, not advanced in normal childhood activities."[3] The chiropractor diagnosed Joshua as having a central nervous system disorder. Joshua was thereupon taken to Dr. Borkowf, a pediatric neurologist, on June 16, 1982, who noted Joshua's inability to sit up and roll over by himself. Dr. Borkowf administered the third DPT and oral polio vaccination to Joshua at this time. In addition, she measured Joshua's head size at 41 cm. Dr. Borkowf also ordered that Joshua be given a skull x-ray, bone age test, EEG, and a CAT scan. The CAT scan revealed prominent ventricles and areas of attenuation compatible with ischemic change. Additional CAT scans performed in December 1982 and January 1987 confirmed these findings.

Joshua presently suffers from cerebral palsy characterized by spastic quadriplegia and developmental delay. He has a mental age of 2 years, is unable to speak, but apparently is able to comprehend speech and enjoys social interaction. He takes no medication for his condition. Joshua operates an electric wheelchair and is capable of feeding himself with some assistance. He attends a special education program in public school.

The special master conducted a hearing in this case in Tampa, Florida, on July 31 and August 1, 1990. Both petitioner and respondent presented lay and expert medical testimony in support of their position. The parties' experts agreed that Joshua suffered a PVL, but differed in opinion as to the timing of the onset of the encephalopathy.[4] The special master issued a decision on September 18, 1990, in which he found that petitioner failed to prove by a preponderance of evidence that: (1) Joshua suffered an encephalopathy within 3 days after the DPT vaccine was administered on February 9, 1982;[5] (2) the DPT vaccine administered to Joshua on February 9, 1982 caused the PVL. Petitioner thereafter filed a motion for review of the special master's decision on October 18, 1990.

1. Dr. Lipschutz examined Joshua on March 15, 1982. The physician's examination notes do not mention any feeding difficulties or behavioral changes.

2. Exhibit (Ex.) B to petition at 076.

3. Ex. 1 at 106.

4. Section 2114(b)(3)(A) of the National Childhood Vaccine Injury Act of 1986 defines "encephalopathy" as "any significant acquired abnormality of, or injury to, or impairment of function of the brain." The special master concluded that PVL impairs the function of the brain and, therefore, meets the statutory definition of "encephalopathy." The parties do not dispute the special master's finding that PVL meets the statutory definition of "encephalopathy."

5. Petitioner initially alleged that an encephalopathy occurred following the administration of DPT vaccine on April 28, 1982. However, all of the live expert testimony introduced by petitioner suggested that the February 9, 1982, vaccination was the alleged cause of the encephalopathy. The special master therefore considered the petition to be amended to reflect the offered evidence in accordance with RUSCC 15(b).

Petitioner contends that expert and lay witness testimony establish that Joshua suffers from an injury compensable under the Act, and that the special master's analysis of the evidence presented by the parties was arbitrary, capricious, and an abuse of discretion. Respondent filed a response to petitioner's motion on November 20, 1990, asserting that the special master's decision was rationally based and supported by the record.

*Discussion*

### A. Standard of Review

Section 2112(e)(2) of the Vaccine Act, as amended, provides in relevant part:

(2) Upon filing of a motion [for review of a special master's decision] with respect to a petition, the United States Claims Court shall have jurisdiction to undertake a review of the record of the proceedings and may thereafter—

(a) uphold the findings of fact and conclusions of law of the special master and sustain the special master's decision;

(b) set aside any findings of fact or conclusions of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law, or

(c) remand the petition to the special master for further action in accordance with the court's direction.

In addition, Rule 5 of the Vaccine Rules, (RUSCC—Appendix J, Section III, *Judge's Review*) mirrors the statutory language set forth above.

In reviewing the special master's decision, the court may therefore set aside findings of fact and conclusions of law which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Brown v. Secretary DHHS*, 920 F.2d 918 (Fed.Cir.1990); *Hines v. Secretary DHHS*, 21 Cl.Ct. 634 (1990). Under this standard of review, the court may not substitute its judgment for that of the special master. *Id.* Rather, the court may only overturn the findings and conclu-

sions reached below where review of the record reveals that no rational basis exists for the decision. *Hyundai Electronics Industries Co. v. United States International Trade Comm.*, 899 F.2d 1204, 1209 (Fed. Cir.1990).

### B. Compensation under the Vaccine Act

Under the Vaccine Act, a party may establish entitlement to compensation for a vaccine related injury or death through two separate means. A qualified petitioner who receives an injury listed on the Vaccine Injury Table, 42 U.S.C. § 300aa–14(a) (Table), within the time period prescribed by the Table is entitled to compensation unless a preponderance of the evidence dictates that the injury was not caused by administration of the vaccine. For injuries not listed on the Table or injuries which occurred outside the time period set forth in the Table, petitioner must prove by a preponderance of the evidence that the injury was actually caused by the vaccine. In either case, the residual effects of the injury must last at least 6 months, and petitioner must have incurred over $1,000 in nonreimbursable expenses occasioned by the injury.

### C. The Special Master's Decision

Petitioner pursued his claim as a Table case. Encephalopathy is a Table-listed injury for DPT vaccine where the manifestation of the onset of the disease occurs within 3 days of the administration of the vaccine. Petitioner offered evidence to prove that an encephalopathy occurred within 3 days after Joshua's February 9, 1982, DPT vaccination. The special master found that petitioner failed to prove by a preponderance of the evidence that an encephalopathy occurred within this 3–day period and that petitioner otherwise failed to show by a preponderance of the evidence that the DPT vaccine caused the encephalopathy. In reaching this conclusion, the special master made the following findings of fact:

1. The only significant event which occurred in the first 3 days after the Febru-

ary 9, 1982, vaccination was Joshua's persistent high pitched screaming.

2. Screaming and crying following a DPT vaccination is much more common than permanent brain damage. Therefore, screaming and crying alone are insufficient indicators to establish the *timing* of an encephalopathy which resulted in permanent brain damage.

3. The opinion of Dr. Kinsbourne, petitioner's medical expert, was solely based on the Mobleys' testimony of Joshua's post-vaccination screaming. Dr. Kinsbourne's testimony is, therefore, unpersuasive.

4. Mrs. Mobley testified that Joshua began to regress in motor development some 2 months after the vaccination. However, Joshua's treating physician made no reference to regression after examining Joshua during this period.

5. Mrs. Mobley testified that Joshua experienced feeding problems approximately one month after the February 9, 1982, DPT vaccination. Yet, the record indicates that Joshua had feeding problems prior to this date.

6. These facts, taken together with Mrs. Mobley's incorrect recollection of Joshua's treating physicians, including the physician who administered the February 9, 1982 vaccine, detract from Mrs. Mobley's overall testimony concerning the description and timing of events during that period.

7. Joshua did not otherwise experience an abrupt change in health immediately following the vaccination.

8. DPT vaccine can cause neurologic dysfunction beyond the 72–hour period prescribed by the Table. The National Childhood Encephalopathy Study found a statis-

tically significant association in the onset of encephalopathy within 7 days of the DPT vaccination.

9. No specific event indicative of an ongoing encephalopathy, such as a seizure, convulsion, or cyanosis, occurred within 7 days of the February 9, 1982, vaccination.

10. Joshua had feeding and arm flexing problems, as well as a below average head size, prior to his first DPT vaccination. According to expert testimony, these facts suggest that Joshua suffered a brain injury during or shortly after birth.

Petitioner identifies several points of alleged error in the special master's decision, all of which question the special master's treatment of evidence offered by petitioner. The court will address petitioner's assignments of error below.

D. Petitioner's Objections to the Special Master's Decision

■ Petitioner asserts that Joshua was a "normal and healthy baby" prior to his first DPT inoculation. Petitioner contends that Joshua "was not fisting, drawing up his arms, or scissoring his legs" before he received his first DPT vaccination. Petitioner also maintains that Joshua did not experience any significant pre-vaccination feeding problems. Petitioner relies primarily on the testimony of Mrs. Mobley to support these contentions. In weighing witness testimony, the court has observed that "[c]ontemporaneous written records have stronger evidentiary value than subsequent memory recall after a significant time lapse." *Bunting v. Secretary DHHS,* 19 Cl.Ct. 738, 752 (1990). The special master found that Mrs. Mobley's testimony in this area was contradicted by various medical records.[6] Since the special master had

---

6. For example, the initial evaluation by a neurologist from the United Cerebral Palsy of Tampa, dated October 19, 1982, stated:

> [Joshua] was always an extremely poor feeder and would not suck a bottle well at all. *From the day he was born apparently has had the arms in a flexed position.* He has been extremely slow in developing his motor milestones. [Emphasis added.]

Petition ex. L, Tab B, p. 000136.

> There were no noted physical problems at the time [of birth] but the family reported later

that *Joshua's baby pictures showed his thumbs turned in and his arms held up all the time.* [Emphasis added.]

*Id.,* p. 000218.

Furthermore, although Mrs. Mobley testified that Joshua's feeding problems began in March 1982 (tr. 38–41), a medical evaluation report by the Tampa Diagnostic and Evaluation Clinic, dated October 18, 1982, indicated:

> [Joshua's] patterns of sleeping and crying were normal during the first month of life. Mrs. Mobley tried to nurse him for three days

the opportunity to evaluate the demeanor and appearance of each witness, his decision to accord little weight to Mrs. Mobley's testimony is entitled to substantial deference by the court. Given that Mrs. Mobley's testimony was inconsistent with Joshua's medical records, the court concludes that the special master did not commit an abuse of discretion in finding her testimony unpersuasive and determining that there was insufficient evidence to demonstrate that Joshua's muscular control difficulties arose after his first DPT vaccination.[7]

Petitioner further argues that expert and lay witness testimony compel the conclusion that Joshua experienced an encephalopathy within 3 days of vaccination. Petitioner avers that Mrs. Mobley's description of Joshua's behavior immediately following the first DPT vaccination, coupled with Dr. Kinsbourne's medical opinion, establishes the occurrence of a Table injury. Mrs. Mobley testified that Joshua developed a high fever, a diminished appetite, and slept sporadically after the February 9, 1982, vaccination. Mrs. Mobley also testified that Joshua screamed and cried inconsolably for 2 days after the vaccination. Dr. Kinsbourne testified that Joshua suffered an encephalopathic reaction to the pertussis vaccine caused by pertussis toxin and endotoxin. In Dr. Kinsbourne's opinion, the encephalopathy occurred within 3 days of the DPT vaccination. The special master found Mrs. Mobley's testimony concerning the events which transpired during that period to be unreliable. Furthermore, the special master concluded that Dr. Kinsbourne's opinion testimony regarding

the timing of the encephalopathy was unpersuasive.

A review of the record indicates that the special master had sufficient reason to assign Mrs. Mobley's testimony little weight. First, Mrs. Mobley's testimony was not corroborated by medical records or other witness testimony. During Joshua's first post-vaccination examination, the treating pediatrician did not document any of the extreme behavioral changes, subsequently related by Mrs. Mobley, in his record of the visit. Further, Dr. Borkowf, a pediatric neurologist, recorded that she did "not know when Joshua first manifested symptoms of encephalopathy following his *second* DPT immunization. [Emphasis added.]"[8] Her records make no mention of any neurological reaction by Joshua to the first DPT inoculation, even though such a reaction would be of considerable significance for treatment purposes. In addition, as previously indicated, portions of Mrs. Mobley's testimony were inconsistent with the medical records introduced by petitioner. Secondly, Mrs. Mobley did not correctly recall Joshua's first physician or the physician who administered the February 9, 1982, DPT vaccine. These erroneous recollections shed doubt on Mrs. Mobley's description of other events which occurred during the time period in question. Given these facts, the court finds that the special master's decision to discount Mrs. Mobley's testimony regarding Joshua's behavior after the February 9, 1982, vaccination was rationally based.

Dr. Kinsbourne based his opinion largely upon the testimony of Mrs. Mobley. As such, the underlying factual foundation of Dr. Kinsbourne's opinion is inherently

---

without success. He seemed to have difficulty accepting the nipple and seemed to tire easily. He was then switched to bottle feeds of various formulas. He also seemed to tire easily.
*Id.,* p. 000126.
This report is corroborated by Joshua's perinatal feeding records, which describe feeding difficulties from December 7 to December 11, 1981. Petition ex. A, p. 014 and 016.

7. Petitioner also contends that the special master misconstrued Mr. Mobley's testimony. At

the hearing, Mr. Mobley testified that Joshua had feeding problems "from the very start." Transcript (Tr.) 215. The court notes that Mr. Mobley's testimony was frequently unfocused and confused. The special master observed the witness and found his testimony unconvincing. However, even if Mr. Mobley's testimony is taken as true, the special master did not commit reversible error in finding that petitioner fell short of meeting his burden of proof in the case.

8. Petition ex. E, Tab B, p. 103.

suspect.[9] To the extent petitioner's medical expert testimony was predicated upon Mrs. Mobley's testimony, the special master was correct in not assigning his opinion considerable value. In any event, the court notes that high pitched screaming and crying alone are insufficient to prove that Joshua suffered an encephalopathy after the first DPT vaccination.[10] Other than such screaming and crying, the record does not reflect an abrupt behavioral change in Joshua following his vaccination. Given the absence of any further indication of a sudden behavioral change in Joshua or contemporaneous medical records corroborating Mrs. Mobley's otherwise questionable testimony, the court sustains the special master's decision that petitioner failed to establish by a preponderance of the evidence that Joshua experienced an encephalopathy within 3 days of the February 9, 1982, DPT vaccination.

Petitioner further challenges the special master's conclusion that there was not a preponderance of evidence that the DPT vaccine administered to Joshua on February 9, 1982, caused PVL. In support of this position, petitioner cites two studies [11] which allegedly lead to the conclusion that neurotoxicity is an acceptable cause of PVL. However, these studies merely indicate that pertussis vaccinations may cause PVL, not that Joshua's DPT vaccination was the actual cause of his PVL. Moreover, the record contains evidence suggesting the onset of PVL prior to the February 9, 1982, vaccination. In his decision, the special master found Joshua's early arm flexing and feeding problems to be significant. The special master concluded that these events, taken together with Joshua's declining head growth shortly after birth, evidenced an earlier onset of PVL.[12] After reviewing the record, the court finds that petitioner failed to provide stronger evidence to the contrary. Petitioner has, therefore, fell short of demonstrating a causal connection between the DPT vaccination and Joshua's PVL and resulting disabilities. The court thus concludes that the record supports the special master's decision that petitioner failed to carry his burden of proof in this case.

**9.** In addition, it should be noted that Dr. Kinsbourne's theory of the process by which pertussis toxin and endotoxin cause an encephalopathic reaction to the pertussis vaccine is not convincing. Dr. Kinsbourne testified:

The best available information is that the pertussis vaccine contains two agents which singly or, more probably, in conjunction can in occasional or rare cases be severely damaging to brain cells and damage them permanently. And these are the pertussis toxin and the pertussis endotoxin, which is also described as a lipopolysacharide. Now, it has been shown by chemical studies that if pertussis toxin is allowed to come into contact with neurons, the basic cells that do the work of the brain, then, that toxin is capable of interfering with the neuron's energy metabolism. Tr. 143.

However, Dr. Kinsbourne also testified that he was not aware of the amount of toxin or endotoxin administered to Joshua on February 9, 1982. Tr. 177. Dr. Kinsbourne further revealed that his theory was based on studies involving intraperitoneal, not intramuscular, injections of toxin and endotoxin into mice. Tr. 178–79. He acknowledged that such injections are not comparable to human vaccine inoculations and that he did not know whether Joshua's blood brain barrier was breached by toxin and endotoxin or how much endotoxin or toxin was necessary to

cause brain damage. *Id.* Given the evidence at hand, the special master could have reasonably concluded that Dr. Kinsbourne's theory was not persuasive.

**10.** Section 2114(b)(3)(A) of the Act states that "high pitched and unusual screaming [and] ... inconsolable crying ... are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy." The special master further notes that while inconsolable screaming and crying occurs in 4 percent of all DPT inoculations, brain damage ensues in only .00033 percent of DPT inoculations.

**11.** The studies relied on by petitioner are entitled: Joseph J. Volpe, M.D., *Neurology of the Newborn* (1981), and Banker and Larroche, "Periventricular Leukomalacia of Infancy," 7 Arch.Neurol. 386 (1962).

**12.** The special master accepted the testimony of Dr. Linder, respondent's medical expert, who opined that Joshua exhibited a "trend of declining head growth in the form of a smooth curve commencing shortly after birth." *Mobley v. Secretary DHHS*, Cl.Ct. No. 90–17V, spec. master slip. op. at 17–18. Dr. Linder testified that this pattern suggests that Joshua suffered a brain injury during birth or shortly thereafter.

*Conclusion*

For the foregoing reasons, the court determines that the special master's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Accordingly, the court upholds the special master's findings of fact and conclusions of law that petitioner is not entitled to recovery under the National Vaccine Injury Compensation Program.

The Clerk is, therefore, directed to dismiss Ronald Mobley's petition on behalf of Joshua Mobley for compensation under the Vaccine Act. No costs.