Donald SCHUMACHER, Sr., Individually and as Personal Representative of the Estate of Donald Schumacher, Jr. and Sharon Schumacher, Petitioners

v.

SECRETARY OF THE DEPT. OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–1621V.

United States Claims Court.

Aug. 5, 1992.

William Dobreff, Warren, Mich., for petitioners.

Alfonso J. Montano, Washington, D.C., for respondent.

## OPINION

MEROW, Judge.

This vaccine case comes before the court on a motion for review filed by the respondent on May 16, 1992, challenging the Special Master's April 24, 1992 decision in this matter.

Petitioner, Donald Schumacher, Sr., as administrator of the Estate of Donald Schumacher, Jr. (hereinafter Donny), deceased, commenced an action in this court on September 27, 1990, under the National Childhood Vaccine Compensation Act of 1986, *codified as amended at* 42 U.S.C. §§ 300aa–1 *et seq.* (West Supp.1991) (Vaccine Act), seeking compensation for Donny's death which occurred on March 4, 1982. Petitioners allege that Donny suffered injuries compensable under the Vaccine Act as a result of DPT vaccine inoculations administered on November 24, 1981 and January 8, 1982. Specifically, the petitioners alleged that Donny had a preexisting neurological condition which was substantially aggravated by the vaccinations and which precipitated his death.

A hearing was held on October 29, 1991 and continued by telephone on November 13, 1991. Testifying for petitioner was Mrs. Sharon Schumacher, Donny's mother, and Marcel Kinsbourne, M.D., a board certified pediatrician qualified as a pediatric neurologist. Testifying for respondent was Lester Adelman, M.D., a board certified neuropathologist, and Harold Fogelson, M.D., a board certified pediatric neurologist. Special Master Baird issued his decision on April 24, 1992, in which he determined that Donald Schumacher, Jr.'s preexisting condition was seriously aggravated by the receipt of a DPT vaccine on January 8, 1982, and that this aggravation was the cause of his death.[1]

---

1. In a partial bench ruling at the close of petitioner's case, the Special Master dismissed peti-

Pursuant to 42 U.S.C. § 300aa–12(e)(1), respondent filed a timely motion on May 26, 1992, seeking review in this court of the Special Master's decision. Respondent's motion is based on two alternate grounds: first, respondent contends that the Special Master erred as a matter of law in finding that the petition in this case was not barred by 42 U.S.C. § 300aa–11(a)(5)(B) because of the existence of a pending civil suit at the time the petition for vaccine compensation was filed; and second, respondent contends that the Special Master's finding that Donny's pre-existing medical condition was seriously aggravated by the DPT vaccine was arbitrary and capricious and thus the decision should be set aside. After a careful review of the Special Master's decision and the entire record, the Special Master's findings of fact and conclusions of law are upheld and his decision is *sustained.*

### BACKGROUND

Donald Schumacher, Jr. (hereinafter Donny) was born on August 12, 1981 in Leominster, Massachusetts. Donny was delivered by Caesarean section with no apparent abnormalities and appeared to have been doing well during the first two months of his life. The only history of illness was colic which was being treated with the anti-colic medication Bentyl for approximately one week prior to October 13, 1981. On that date, Donny suffered cardiopulmonary arrest and was discovered by his parents as cyanotic and apneic.[2] There is conflicting evidence as to how long Donny had stopped breathing before he was discovered by his parents, but it appears that it could have been as long as 10–

15 minutes. Donny was taken to Burbank Hospital by ambulance where his heart rate was reestablished by CPR and medication. He was then transferred to the University of Massachusetts Medical Center with a diagnosis of cardiopulmonary arrest.

During his hospital stay, Donny was placed on a respirator. He had episodes of apnea and bradycardia and started experiencing seizure activity on October 14. On October 16, 1981, an order was given by Donny's mother not to resuscitate in the event of another cardiac arrest. The impression of Dr. Paul C. Marshall, the treating neurologist at the University of Massachusetts, was that Donny was severely impaired as evidenced by abnormal EEG readings (which indicated multifocal spikes) and Donny's overall clinical condition. Donny was comatose until November 5. He did not have seizures the last two weeks of hospitalization and was discharged to his parents home on November 18, 1981. He was unable to feed himself or clear his secretions thus requiring supportive home care, *i.e.*, nasogastric tube feedings, manual suctioning and chest physiotherapy, after discharge.

Donny suffered a seizure a few days after he was discharged, but his mother testified that he appeared to be getting better after he was released from the hospital. The parents noticed cyanosis around Donny's lips and contacted his pediatrician, Dr. Martin Feldman, who advised them to obtain a cardiac monitor which would sound an alarm in the event Donny's breathing or heart stopped.

---

tioner's claim with respect to the significant aggravation that allegedly occurred after the first DPT shot in November 1981. He based the dismissal on Mrs. Schumacher's testimony that Donny recovered after the first shot, and Dr. Kinsbourne's testimony that he did not believe the first DPT shot caused a permanent deterioration of Donny's condition.

**2.** For edification, certain medical terms used throughout this opinion are defined below:
Anoxic: Marked by the abnormal condition in which the oxygen content of the cells and the tissues of the body is below normal.
Apnea: A temporary cessation of breathing; a temporary suspension of breathing due to a

decrease in the carbon dioxide content of the blood, carbon dioxide being the substance which stimulates breathing.
Bradycardia: Slowness of the heart beat; a condition of bradycardia exists when the rate of heart beat is 60 or less per minute.
Cyanosis: The condition in which the normal color of the skin is replaced by a bluish tinge, indicating a lack of oxygen in the blood.
Encephalopathy: A degenerative disease of the brain.
*See Attorneys' Dictionary of Medicine Illustrated,* Matthew Bender & Co., Inc. (1992)

On November 24, 1981, Dr. Feldman administered Donny's first DPT shot. The extent of Donny's seizure activity between his discharge and the first DPT shot is unclear. Donny had seizures on November 25 and was hospitalized on November 27 because of increased seizure activity, apnea and bradycardia. Examination during this hospitalization indicated that Donny did not exhibit normal neurological functions for his age; he was not responsive to auditory or visual stimuli, and had no responsive suck or startle, but was able to move all extremities. He was hospitalized until December 11, 1981 and his condition upon discharge was classified as "Poor" by Dr. Paul C. Marshall. The parents obtained an ambubag and oxygen for home use.

On January 8, 1982, Donny visited his pediatrician. Dr. Feldman's notes from January 8 indicate that Donny's cardiac monitor had not gone off in 1.5 weeks that he was able to roll front to back, smile, follow his mother, and react to noise. Mrs. Schumacher testified that Donny could cry, lift his head up, push himself up and move his arms. Donny was administered his second DPT shot on that date.

On January 9, 1982, the morning after his second DPT shot, Donny had a fever of 102.4 and had increased seizure activity. He was taken to the hospital with a complaint of "fever seizures" and a temperature of 101.9. He was transferred to the University of Massachusetts where he remained until January 13. During his hospitalization he had numerous seizures, bradycardia episodes and apnea requiring stimulation or bagging. Dr. Marshall noted in the discharge summary, *inter alia*, that Donny had been "relatively seizure free for the past two weeks" and that he had a weak suck, relatively good neck control and that he could raise himself to tripod posi-

tion. These were mild developmental milestones, and Donny's condition upon discharge was "Fair." [3] Donny visited Dr. Marshall on January 28, 1982 who concluded that while Donny was "showing some very minimal developmental progress" the overall outlook for him was poor.

Donny saw Dr. Feldman on February 9, 1982. Dr. Feldman's notes indicated that Donny had a seizure a few days before and that his apnea monitor had been sounding two to three times a night, which, according to Donny's mother, did not necessarily indicate that Donny was having a seizure. Dr. Feldman also noted that Donny appeared more alert and was eating baby food well.

Donny was taken to Dr. Feldman on February 22 because of congestion and a fever of 102. Mrs. Schumacher reported that Donny had suffered a respiratory arrest lasting two minutes the previous night which required resuscitation. Donny was diagnosed as having pneumonia. Donny was seen again by Dr. Feldman on March 2, 1982 for a follow-up visit. Apparently, he had recovered from his pneumonia because his chest was clear. Donny was scheduled to return for his third immunization in one week.

Donny died on March 4, 1982. The autopsy report indicates that Donny died "as a result of complication of anoxic encephalopathy which resulted from cardiopulmonary arrest of unknown etiology approximately 5 months antemortem." The autopsy slides of his brain revealed an abnormality in Donny's brain that had occurred during his prenatal development. There was evidence of gliosis [4], presumably due to anoxia, and there was also evidence of abnormal neuronal migration around the ven-

---

**3.** Donald was seen at home by personnel from the Herbert Lipton Mental Health Center on January 25, 1982. An intake summary prepared by Ms. Katie Houston indicates that Donald was on an apnea monitor at night and that he continued to have episodes of cardiopulmonary arrest which occasionally required heart massage and oxygen. The report noted that Donald's seizure problems are being treated with medication and that "Seizures occur less frequently now and usually occur when Donny has a high fever." *See* Special Master Decision at 6.

**4.** Gliosis is defined as "an overgrowth of neuroglia, the supporting tissue and framework of the nervous system (brain and/or spinal cord) at the expense of the true nervous tissue."
*See Attorneys' Dictionary of Medicine Illustrated,* Matthew Bender & Co., Inc. (1992).

tricles. This abnormality was not identified while Donny was alive.

## DISCUSSION

### I. Standard of Review

Before analyzing the Special Master's decision in this case, it is appropriate to discuss Congressional intent in enacting the Vaccine Act. It is clear that this legislation established a no-fault system for providing compensation to children injured by mandatory pediatric vaccinations routinely administered before admission to the public school system. H.R.Rep. No. 99–908, 99th Cong., 2d Sess. 1, 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344:

> [C]ongress intended [to create] a quick, flexible, and streamlined system. [The original legislation] called for a compensation procedure that administered awards "quickly, easily, and with certainty and generosity." The system was intended to be fair, simple, and easy to administer "and to compensate persons with recognized vaccine injuries without requiring the individual determinations of causation of injury."

H.R.Conf.Rep. No. 101–386, 101st Cong., 1st Sess. 509, 512, *reprinted in* 1989 U.S.Code Cong. & Admin.News 1906, 3112, 3115, *citing* H.R.Rep. No. 99–908, 99th Cong., 2d Sess. 1, 3, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344.

■ The Special Master initially determines whether a petitioner is entitled to compensation under the Vaccine Act and, if so, the amount of the award. Review of the Special Master's decision by a judge of the United States Claims Court is available to the parties pursuant to 42 U.S.C. § 300aa–12(e). The Special Master's decision must be upheld unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 42 U.S.C.

§ 300aa–12(e)(2)(B). *See also, Dolney v. Secretary of the Dep't of Health & Human Servs.,* 23 Cl.Ct. 337, 341–42 (1991); *Metzger v. Secretary of the Dep't of Health & Human Servs.,* 22 Cl.Ct. 123, 127–28 (1990); *Loe v. Secretary of the Dep't of Health & Human Servs.,* 22 Cl.Ct. 430, 432 (1991); *Mobley v. Secretary the Dep't of Health & Human Servs.,* 22 Cl.Ct. 423, 426 (1991). The scope of review under the "arbitrary and capricious" standard is narrow and the court is not to substitute its judgment for that of the decision maker. *Motor Vehicle Mfrs. Asso. v. State Farm Mutual Automobile Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The touchstone of the arbitrary and capricious standard is rationality. *Hyundai Electronics Industries Co. v. United States Int'l Trade Com.,* 899 F.2d 1204, 1209 (Fed. Cir.1990). If the decision maker has considered the relevant factors and has not made a clear error of judgment, the decision must be affirmed. *Id.*

### II. Petitioner's Pending Civil Suit Against Merrell Dow Pharmaceuticals Does Not Preclude Suit Under the Vaccine Act:

■ On May 12, 1987, the petitioners filed a civil action, Docket No. 87–0025–XX, against Merrell Dow Pharmaceutical Company, and others, in the United States District Court in Worcester, Massachusetts. That case is pending and has not been dismissed or otherwise resolved.[5] The civil action against Merrell Dow is based on that company's manufacture and distribution of Bentyl, an anti-colic medication administered to Donny approximately one week prior to his cardiopulmonary arrest of October 1981 and before his first DPT vaccination.

---

5. On November 2, 1989, petitioners filed a claim, No. 89–109V, seeking compensation under the Vaccine Act. During the course of those proceedings, it was discovered that the petitioners also had filed a civil suit against the vaccine administrator, Dr. Martin Feldman, that was pending at the Superior Court in Worcester, Massachusetts, Docket No. 86–34429. Respondent filed a motion to dismiss the Vaccine Act

petition based on 42 U.S.C. § 300aa–11(a)(5)(B), which precludes the filing of a petition for vaccine compensation during the pendency of a civil action for damages for the vaccine-related injury or death. That motion was granted on August 31, 1990. Petitioners dismissed their civil action against Dr. Feldman and filed another petition in this court on September 27, 1990.

It is undisputed that the pending Merrell Dow action is not against the vaccine manufacturer. However, the respondent claims that the Merrell Dow litigation is a suit for a vaccine-related injuries and death because that complaint alleges, *inter alia*, that Bentyl and the subsequent DPT shot, working in conjunction, contributed to Donny's death, thus mandating dismissal of the Vaccine Act litigation pursuant to 42 U.S.C. § 300aa–11(a)(5)(B).

The complaint in the Merrell Dow litigation alleges that plaintiff's injuries were caused "solely and proximately by Defendant [Merrell Dow], Merrell Dow's negligence and as a proximate result of the defective drug." [6] Upon discovering that the petitioners had a pending suit against Merrell Dow, respondent filed a motion to dismiss under 42 U.S.C. § 300aa–11(a)(5)(B). That motion was denied on April 26, 1991 because the Special Master determined that the Merrell Dow action does not disqualify the petitioners from seeking compensation under the Vaccine Act because the Merrell Dow action is a civil action against a Bentyl manufacturer for a Bentyl-related injury. The special master's determination that dismissal is not warranted under the circumstances is correct.

Section 300aa–11(a)(5)(B) of the Vaccine Act provides as follows:

> If a plaintiff has pending a civil action for damages for a vaccine-related injury or death, such person may not file a petition under subsection (b) of this section for such injury or death.

The Vaccine Act's definition section, 42 U.S.C. § 300aa–33(5), defines a "vaccine-related injury or death" as "an illness, injury, condition, or death associated with one or more of the vaccines set forth in the Vaccine Injury Table." The legislative history of the Vaccine Act indicates that the Congressional intent in enacting the legislation was to relieve vaccine manufacturers from defending against civil suits.[7]

■ Statutory interpretation begins with the plain language of the statute, with the assumption that the language's ordinary connotation accurately reflects congressional intent. *Amendola v. Secretary of the Dep't of Health & Human Servs.*, 23 Cl.Ct. 621, 624 (1991) (citations omitted). Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive. *Id.*, citing *Consumer Prod. Safety Com. v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Here, the statutory language is clear. It precludes a pending suit against a vaccine manufacturer while concurrently seeking compensation under the Vaccine Act. In the case at bar, the pending litigation against Merrell Dow relates to its manufacture of Bentyl, an anti-colic medication, not a vaccine, and therefore does not preclude a suit for compensation under the Vaccine Act.

### III. *Special Master's Finding of Significant Aggravation is Not Arbitrary and Capricious*

■ Petitioners assert that administration of the DPT vaccine on January 8, 1982

---

**6.** *See* Petitioner's Opposition to Motion for Review at pp. 3–4.

**7.** The Vaccine Act's legislative history demonstrates that the legislation was intended to protect vaccine manufacturers from the unavoidable side effects of an "unavoidable unsafe" product. H.R.Rep. No. 908, 99th Cong., 2d Sess. 26, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6344, 6367 ["House Report"]. By protecting manufacturers from lawsuits, the vaccine manufacturers would have the ability to remain in business, as well as to continue production of the needed supplies of vaccines. *Id.* at 6, 1986 U.S.Code Cong. & Admin. News at 6347. *See also* House Report at 4, 1986 U.S.Code Cong. & Admin. News at 6345 (ex-plaining that the need for legislation stemmed from problems with vaccine manufacturers); House Report at 12, 1986 U.S.Code Cong. & Admin. News at 6353 (Committee on Energy and Commerce stated that the vaccine bill was intended to lessen the number of lawsuits against vaccine manufacturers); S.Rep. No. 483, 99th Cong., 2d Sess. at 5 (1986) ["Senate Report"] (Senate Committee on Labor and Human Resources focused on remedies to problems only with vaccine manufacturers); 132 Cong. Rec. 33116 (Daily ed. Oct. 17, 1986) (statement of Rep. Waxman noting that vaccine bill would limit a child's ability "to sue the manufacturer of the vaccine").

significantly aggravated Donny's pre-existing encephalopathy and triggered a series of physiological events that ultimately led to Donny's death. The Vaccine Act provides for coverage for significant aggravation of a seizure disorder. 42 U.S.C. § 300aa–13(a) provides as follows:

(1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—

(A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

■ The preponderance of the evidence standard requires that the Special Master believe that the existence of a fact is more probable than not before he may find in favor of the party who has the burden of proof. *See In re Winship*, 397 U.S. 358, 370–71, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970).

"Significant aggravation" is defined as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by a substantial deterioration of health." 42 U.S.C. § 300aa–33(4). The legislative history of the Vaccine Act clarifies the definition of "significant aggravation":

The Committee has included significant aggravation in the Table in order not to exclude serious cases of illness because of possible minor events in the person's past medical history. This provision does not include compensation for conditions which might legitimately be described as pre-existing (*e.g.*, a child with monthly seizures who, after vaccination, has seizures every three and a half weeks), but is meant to encompass serious deterioration (*e.g.*, a child with monthly seizures who, after vaccination, has seizures on a daily basis). The Committee also intends that the time periods set forth in the Table apply to the significant aggravation in order for causation to be deemed to exist (*e.g.*, a significant deterioration of a seizure disorder after [DPT] vaccination must first become manifest within three days of the vaccination).

H.R.Rep. No. 908, 99th Cong., 2d Sess. 15, 16, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6356–57. 42 U.S.C. § 300aa–13(b)(2) establishes that significant aggravation must occur within a certain period of time after the administration of a vaccine:

The special master or court may find the first symptom or manifestation of onset or significant aggravation of any injury, disability, illness, condition, or death described in a petition occurred within the time period described in the Vaccine Injury Table even though the occurrence of such symptoms manifestation was not recorded or was incorrectly recorded as having occurred outside such period. Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset or significant aggravation of the injury, disability, illness, condition, or death described in the petition did in fact occur within the time period described in the Vaccine Injury Table.

According to the Vaccine Table, the time period for significant aggravation of a seizure disorder following administration of the DPT vaccine is 3 days. 42 U.S.C. § 300aa–14(a).

After reviewing the evidence in this case and hearing the testimony of the witnesses, Special Master Baird determined that, within three days after Donny received his second DPT vaccine on January 8, 1982, his symptoms were significantly aggravated, that this aggravation continued up until his death, and that his death was causally related to the significant aggravation which resulted from his second DPT vaccine. Furthermore, he determined that there was not a preponderance of the evidence that this aggravation was caused by a known factor unrelated to the administration of the vaccine. Special Master Baird stated in his April 24, 1992 Decision:

The court agrees with Dr. Fogelson that it is very likely that Donny would not be alive today even if his condition had remained stable throughout the early part of 1982. His brain disease was such that at some point the complications of his encephalopathy—directly or indirectly—would have led to his death. In that sense, the encephalopathy was the ultimate cause of death. But in the context of the aggravation which occurred following the January 8 vaccination and which continued until his death, it was that aggravation which was more likely than not the immediate cause of his death.... That Donny could have died at any time does not mean that he would have. Something had to trigger the life threatening events, and in this case they recommenced during the three day period following January 8 * * *.

Decision at 15.

Respondent contends that the aggravation of Donny's symptoms, the result of which was to ultimately lead to his death, was not related to the administration of the second DPT vaccine. In essence, respondent argues that although the symptomatology, i.e., apnea, seizures, bradycardia, may have increased temporally after the administration of the vaccine, this increase was not causally related to the vaccine because these symptoms can be reasonably attributed to Donny's underlying brain disease.

The parties' expert witnesses disagreed as to whether the second DPT vaccine resulted in a series of physiological events that ultimately led to Donny's death. Petitioners' expert, Dr. Marcel Kinsbourne, a pediatrician and pediatric neurologist recognized as an expert in vaccine-related injuries, testified that Donny's cardiopulmonary arrest in October 1981 resulted in anoxic encephalopathy. The receipt of the first DPT vaccine in November 1981 caused a significant aggravation of the neurological condition and caused a loss of developmental skills, but that the damage was not permanent. He stated that the receipt of the second DPT vaccine in January 1982 also caused a significant aggravation of Donny's encephalopathy but this time resulted in a permanent increase in seizure activity, apnea, bradycardia. This DPT shot caused a deterioration of Donny's health because the incidence of apnea, bradycardia and seizures did not decrease over time as they had after Donny's prior two hospitalizations.[8] Therefore, Dr. Kinsbourne concluded that it was his opinion, to a reasonable degree of medical certainty, that Donny's death was due to the aggravation to his neurological condition caused by the second DPT vaccine.[9]

Dr. Lester Adelman, a neuropathologist testifying on behalf of respondent, testified that, after reviewing the autopsy slides, he

8. Q [Mr. Montano]: Let's go on to Donald's unfortunate death. You stated to a reasonable degree of medical certainty on direct testimony that Donald's death was caused by the aggravation to his condition caused by the DPT vaccine?

A [Dr. Kinsbourne]: Yes.
Q: What is the basis for that opinion? Again, is it from the parent's testimony and what they said to [the developmental worker from the Lipton Mental Health Center]? * * *
A: The basis of that opinion is my impression from the records and the testimony that whereas after the anoxic event and after the first DPT, there came a time when there was a waning of life-threatening events. After the second DPT there did not come such a time. Now I know that this was attested by the parents and by [the developmental worker from the Lipton Mental Health Center]. I can't recall right now whether there wasn't also medical statement to that effect in the record.
Transcript at 164–65.

9. Q [Mr. Dobreff]: The records go on to indicate that he was immunized. The following morning he developed a temperature of 102.4 followed by seizure activity, eyes rolled to the back of his head and he quite [sic] breathing for 4.25 seconds.... He experienced approximately three seizure episodes prior to arriving at Burbank [Hospital]. Would that be a significant aggravation of the condition as it was prior to the DPT vaccine?

A [Dr. Kinsbourne]: It would be.
Q: Did these record of this hospitalization indicate that the child had been seizure free for two to three weeks ... prior to the DPT?
A: Yes.
Q: What would that be indicative of?
A: That a stable status had been achieved.
Q: If you combine that with the fact that the apnea monitor had not gone off in ten days, what would that indicate?
A: It would indicate more of the same.
Transcript at 122–23.

believed Donny's seizure disorder was attributable either to damage to the hippocampus which was due to the anoxic encephalopathy of October 1981, or abnormal brain formation as evidenced by decreased neuronal migration from the central part of the brain into the cerebral cortex. He stated there was no pathological evidence (*i.e.*, evidence apparent in the autopsy slides) documenting the occurrence of post-vaccination aggravation. The government contends that the Special Master improperly ignored this testimony that there was "no pathological evidence of any change in Donny's underlying condition following his January 8, 1982 DPT vaccination." Respondent's argument is meritless for two reasons. First of all, the Special Master is not bound by any medical diagnosis, conclusion, judgment, test result, report or summary, and the weight of any such evidence is to be evaluated in light of the entire record. 42 U.S.C. § 300aa–13(b)(1). Second, on re-cross, Dr. Adelman admitted that the absence of anatomic damage does not preclude the existence of physiologic abnormalities.

Respondent's other expert witness, Dr. Harold Fogelson, a pediatric neurologist, testified that Donny's symptomatology was due to his underlying brain damage and that, in his opinion, the progression of his symptoms cannot be attributed to the DPT vaccine. However, there is one portion of Dr. Fogelson's testimony that is particularly significant. Upon questioning by Special Master Baird, Dr. Fogelson indicated that the increase in seizures following the second DPT shot was due to an increase in temperature that resulted because of the shot.[10] He further went on to testify that frequently, in children with brain abnormalities, there are instances where a temperature elevation will result in or cause a breakthrough in seizures that are difficult to control even after the fever subsides.[11] These statements are inconsistent with Dr. Fogelson's opinion that the DPT shot did not significantly aggravate Donny's underlying medical condition. The fact that Donny was seizure-free for two weeks before the DPT shot, that he suffered post-DPT seizures, that he was hospitalized for "fe-

10.   Q   [Special Master Baird]: [Y]ou indicated in your testimony that Donny would have died, even if he had never received a DPT shot. Are you able to say, with a reasonable degree of medical probability, that his condition would have worsened, and he would have died within the time frames which existed in this case, but for the—even without the DPT shot?

A [Dr. Fogelson]: No, I'm not able to say that ... I'm able to say only that he would die, but I would not be able to give you a time frame.

Q: So you're not testifying that death didn't happen earlier than it would have otherwise have happened, as a result of the January DPT shot?

A:   No, I'm not.

Q:   Do you have an opinion as to whether or not he died earlier, as a result of that shot?

A:   My opinion is he did not die earlier, as a result of the DPT shot.

Q:   There's a reference in the records that ... he was having seizures less frequently than before, and that's in I believe, a late January record ... Couldn't it be consistent with that entry, that he was having seizures less frequently, than he had when he was hospitalized on January 9, but they were still more frequent than before the January 8 DPT shot?

A:   Yes.

Q:   Would you agree, Doctor, that there was at least in this case, if nothing else, an acute exacerbation of seizures, following the January

DPT shot, which the treating physicians thought might be causally related to the shot?

A: Yes. And I relate that to the temperature elevation that occurred, following the DPT shot.

Q: So you would think it was related to the fact that he had a—that the shot caused a fever.

A: Yes. * * * I believe the DPT produced the temperature elevation for the child, and exacerbated to seizures. This goes along with the notes from the Lipton Center, which says Donald was having seizures with temperature elevations.

Transcript at 342–344.

11.   Q   [Special Master Baird]: If Donald went from no seizures, for two weeks prior to the [DPT] shot, to seizures every day, after the shot, would that affect you opinion on the role of the DPT vaccine, in Donald's death?

A [Dr. Fogelson]: [F]requently ... we have kids who have had good control of seizures, and then have a temperature elevation, and a breakthrough with seizures. And we have a devil of a time controlling them. So it does not necessarily mean that there [sic] are progressive, in the sense that these children have a worsening epileptic condition, it's just that he's out of control with the onset of the seizures.

Q: You have a devil of a time controlling them, even after the fever goes down?

A: On some brain damaged children, yes.

Hearing Transcript at 345.

brile seizures" the day after his vaccination and that his symptomatology increased thereafter, indicates that the DPT vaccine triggered a series of events leading to Donny's deterioration. As Special Master Baird noted, "if the vaccine caused the fever and the fever caused a breakthrough in symptoms, that breakthrough can not properly be attributed to a factor unrelated to the administration of the vaccine. It must be attributed to the vaccine." Decision at 14.

■ In its Motion for Review, the respondent contends that the Special Master's decision was incorrect because it focused on short-term increase in symptomatology rather than looking at the long-term implications of Donny's underlying condition, in contravention of the *Misasi* test. Under *Misasi v. Secretary of the Dep't of Health & Human Servs.*, 23 Cl.Ct. 322 (1991), the Claims Court articulated a four-pronged test to evaluate whether an individual suffered significant aggravation of a particular condition: the trier of fact must "(1) assess the individual's condition prior to administration of the vaccine, *i.e.*, evaluate the nature and extent of the individual's pre-existing condition, (2) assess the individual's current condition after the administration of the vaccine, (3) predict the individual's condition had the vaccine not been administered, and (4) compare the individual's current condition with the predicted condition had the vaccine not been administered. A petitioner satisfies Section 13(a)(1)(A) if he or she establishes by a preponderance of the evidence that the individual's current condition constitutes a significant aggravation of the individual's predicted condition had the vaccine not been administered." *Misasi*, 23 Cl.Ct. at 324. Respondent contends that the Special Master's "narrow focus"—*i.e.*, his examination of Donny's condition before and after the second DPT shot—improperly ignores an important component of the *Misasi* analysis, *i.e.*, whether the DPT vaccine caused a long term change in the predicted course of Donny's underlying condition.

■ The *Misasi* standard does not alter the petitioner's initial burden when demonstrating presumed causation under 42 U.S.C. § 300aa–13(a)(1)(A). In making a prima facie showing of presumed causation, petitioners need not prove causation or disprove possible alternative causes for the deterioration in the child's pre-existing condition following the vaccination. *O'Connor v. Secretary of the Dep't of Health & Human Servs.*, 24 Cl.Ct. 428, 429 n. 2 (1991); *McClendon v. Secretary of the Dep't of Health & Human Servs.*, 24 Cl.Ct. 329, 334 (1991). In endeavoring to prove, by a preponderance of the evidence, that the injury was due to a factor "unrelated to the administration of the vaccine," the respondent must show that the alleged alternative cause was "the agent principally responsible for causing the petitioner's illness, disability, injury, condition or death." 42 U.S.C. § 300aa–13(a)(2)(B); *McClendon v. Secretary of the Dep't of Health & Human Servs.*, 24 Cl.Ct. at 334. The *Misasi* standard is implicated only after the respondent has met its burden under 42 U.S.C. § 300aa–13(a)(1)(B) of showing an actual alternative cause, *i.e.*, the natural progression of the pre-existing condition rather than vaccination. *O'Connor v. Secretary of the Dep't of Health & Human Servs.*, 24 Cl.Ct. at 430 n. 2. In the case at bar, the Special Master determined that the respondent had failed its burden of showing by a preponderance of the evidence that Donny's post-DPT neurological condition was due to his pre-exisis pre-existing condition rather than the vaccine.

■ Furthermore, there is nothing in the Vaccine Act or its legislative history that mandates the application of the *Misasi* analysis in claims alleging significant aggravation. *Misasi* is a judicially-created test which attempts to facilitate the analysis of significant aggravation cases by articulating a standard by which all such cases are decided. However, given the applicable statutory criteria, it is not possible to apply the analysis rigidly in all cases. The mere fact that a petitioner fails to satisfy all four prongs of the *Misasi* test does not *per se* indicate that no significant aggravation occurred in a particular case.

For example, it would have been impossible for the Special Master strictly to apply the *Misasi* four-pronged test in this case. First of all, the third and fourth criteria of the test are indeterminable because Donny died approximately two months after receiving the DPT shot and it is impossible to predict the course of Donny's physical condition absent the vaccination. It is undisputed, and the Special Master conceded in his Decision, that Donny would probably not be alive today even absent receipt of the DPT shot. However, the fact that we can "predict" that Donny would have died—eventually—from his underlying medical condition does not mean that we can predict how long he would have lived or what his condition would have been without the second DPT shot. The fact that his overall prognosis was not good does not change the fact that his physical state, which had begun to stabilized pre-DPT, began to deteriorate after, and as a result of, the second DPT shot. Although Donny probably would have had seizures, apnea spells and bradycardia even absent the DPT shot, it is uncertain how long the stability of his symptomatology would have lasted. None of the medical experts could predict how long Donny could have lived absent this second inoculation, nor how long his symptomatology could have remained stable without the DPT shot. Therefore, it is impossible to compare his actual post-DPT condition with his putative absent-DPT condition without relying on conjecture and speculation. Under the circumstances a rigid application of the *Misasi* test would render unjust results.[12]

## CONCLUSION

In its capacity as the reviewing court in vaccine compensation cases, the Claims Court may not substitute what would have been its judgment had it initially decided the matter. The Claims Court may not substitute its own judgment for that of the Special Master. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). While there is evidence in the record that would support a contrary conclusion, the Special Master's decision must be upheld if there is a rational connection between the evidence presented and the conclusion reached. *See Sumrall v. Secretary of the Dep't of Health & Human Servs.*, 23 Cl.Ct. 1, 4 (1991), citing *Consolo v. Federal Maritime Com.*, 383 U.S. 607, 618–21, 86 S.Ct. 1018, 1025–27, 16 L.Ed.2d 131 (1966) (even under the substantial evidence standard of review, which requires less deference to the decision maker than does the arbitrary and capricious standard, the decision maker's conclusion must be upheld even if there is evidence in the record that would lead to a contrary result, so long as there is substantial evidence to support the result reached). *See also Hambsch v. Dep't of Treasury*, 796 F.2d 430, 436 (Fed.Cir.1986) (where there is conflicting evidence, appropriate deference is given to the Special Master's findings of fact).

The issue in this case is whether the administration of the DPT vaccine resulted

12. *See also Costa v. Secretary of the Dep't of Health & Human Servs.*, 90–1476V (August 26, 1992). Although *Costa* involved a child with latent, non-clinical tuberous sclerosis at the time of vaccination, Special Master Millman's analysis and her analogy to tort law principles is *nonetheless instructive.*

As Special Master Millman correctly points out in her decision in *Costa*, under traditional tort law the defendant takes his victim as he finds him. *Costa* at 48. It is also an accepted principle of tort law that where the negligent infliction of injury aggravates a pre-existing condition or disease, and no apportionment is possible, the defendant is liable for the entire damage. *Id.* at 60 (citations omitted). She also points out that under other legislatively enacted compensation schemes (*e.g.,* Longshoremen's

and Harbor Worker's Compensation Act, 33 U.S.C. § 901 *et seq.*), aggravation of a pre-existing condition is considered a compensable injury. *Costa* at 48–50.

Congressional intent in passing the Vaccine Act was to "'establish a Federal "no-fault" compensation program under which awards can be made to vaccine-injured persons quickly, easily, and with certainty and generosity.'" *Costa* at 48, citing H.R.Rep. No. 908, 99th Cong., 2d Sess. 3 (1986), U.S.Code Cong. & Admin.News 1986, p. 6344. Therefore, "[i]f accepted tort law is that the defendant takes his victim as he finds him, it would be strange indeed for Congress to intend in passing the Vaccine Act to make it harder for petitioners to prevail than if they were in the customary forum for resolution of tort claims." *Costa* at 48.

in a series of physiological events that caused a significant aggravation of Donny's symptomatology, which had been relatively stable prior to the DPT second shot. Although in some respects Donny seemed to be improving after his January 8 DPT vaccination, the record supports the Special Master's determination that overall physical condition began to deteriorate and that the post-DPT increase in symptomatology was permanent.[13] It is clear that the post-DPT temperature elevation[14] had a permanent effect on Donny. Although the respondent characterizes the post-DPT fever and associated seizures as "transient in nature" and not resulting in a significant aggravation of his underlying encephalopathy, Donny was not a neurologically normal child and thus what could have been a "transient" event in a healthy child resulted in a permanent deterioration in Donny's case.[15] The administration of DPT shots to a child with known anoxic encephalopathy was probably inappropriate and contraindicated under the circumstances.[16] In any event, the record fully supports the Special Master's finding of significant aggravation. As the Special Master did not act arbitrarily, capriciously or contrary to law when he awarded compensation to the petitioners, his decision is *sustained* and judgment shall be so entered.

13. As the Special Master stated in his decision:

What concerns the court most is that Donny had continuing episodes of cardiopulmonary arrest following the January 8 shot. These were noted by Ms. Houston [case worker from Lipton Mental Health Center] on January 25, by Dr. Marshall on January 28, and by Dr. Feldman on February 22. His parents sometimes were required to use oxygen and heart massage to revive him. These efforts were not required between the November–December hospitalization and the second DPT shot. Donny died from cardiorespiratory arrest on March 4. Dr. Fogelson acknowledged that such events are life threatening. He also acknowledged that apneic episodes which require bagging are life threatening and that Donny's apneic and bradycardia episodes became clinically more frightening. And he acknowledged that something which converts a stable condition into a life threatening one constitutes a significant aggravation. Dr. Adelman acknowledged that the vaccine could have had an adverse clinical effect without pathological damage, so the absence of new pathological damage does not mean that there could not have been a clinical aggravation.

Because there was a sharp increase in the frequency of life threatening events from January 8 up until Donny's death on March 4, the court is persuaded that there was a significant aggravation under the Vaccine Injury Table, § 14(a) of the Act. * * *

[T]here is no doubt that Donny's preexisting brain damage could have caused all of the symptoms which occurred after January 8, including his death. Clinically Donny was much sicker during the October–November hospitalization than he was at any other time thereafter. While his condition stabilized, it stabilized at a very low level, and he was susceptible to aggravation of symptoms at any time. The only times that aggravation occurred, however, were following the two DPT shots.

Decision at 13–14.

14. Temperature elevation is a common reaction to the DPT vaccine. Fever is the body's natural response to introduction of a foreign substance, whether it is live bacteria or "killed" bacteria in a vaccine, into the body causes the immune system to produce antibodies to fight the foreign substance, resulting in temperature elevation. Pertussis vaccine is known to cause fevers. A high fever in an infant can result in febrile convulsions and although some post-DPT seizures are simple febrile convulsions that do not result in brain damage or continuing seizure disorder, other post-DPT febrile convulsions may trigger permanent seizure activity. *See* Harris L. Coulter & Barbara Loe Fisher, *DPT: A Shot in the Dark* at p. 55 (1985).

15. *See* footnote 11, *supra*.

16. For example, according to an article in the Journal of the American Medical Association, "The presence of a neurological condition characterized by changing developmental or neurological findings, regardless of whether a definitive diagnosis has been made, is ... considered a contraindication to receipt of pertussis vaccine, because administration of DTP may coincide with or possibly even aggravate manifestations of the disease." *Diphtheria, Tetanus, and Pertussis: Guidelines for Vaccine Prophylaxis and Other Preventive Measures*, 254 JAMA 1009–1016 (August 23, 1985). Dr. Kinsbourne also testified that the DPT vaccine is contraindicated if the child has a neurological condition or a seizure condition. *See* Transcript at 104. Under the circumstances, Special Master Baird's suggestion that the respondent should seriously consider a subrogation action pursuant to 42 U.S.C. § 300aa–17 is seconded.