Kenneth REUSSER and Brenda Reusser, Parents and Next Friends of, Jonathan Reusser, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–1114V.

United States Court of Federal Claims.

May 24, 1993.

Richard Gage, Cheyenne, WY, for petitioners.

Mary Hampton Mason, Washington, DC, for respondent.

## OPINION

YOCK, Judge.

This vaccine case is before the Court on a Motion for Review of Special Master's Decision, filed by petitioners on January 21, 1993, challenging the special master's decision denying their claim for compensation.

Petitioners, Kenneth Reusser and Brenda Reusser, filed a petition on behalf of their son, Jonathan, for compensation under the National Vaccine Injury Compensation Program, *codified as amended* at 42 U.S.C.A. §§ 300aa–1 *et seq.* (West 1991) (Vaccine Act). Petitioners allege that Jonathan suffered injuries compensable under the Vaccine Act as a result of DPT vaccine inoculations administered on August 12, 1985, and September 11, 1985. An evidentiary hearing was held on January 30, 1992, in Washington D.C., during which the special master heard both lay and expert testimony. The special master issued her decision on December 21, 1992, in which she determined that the petitioners had failed to establish, by a preponderance of the evidence, their right to entitlement under the Vaccine Act.

Pursuant to 42 U.S.C.A. § 300aa–12(e)(1) (West 1991), petitioners filed a timely motion on January 21, 1993, seeking review in this Court of the special master's decision. For the reasons discussed herein, the petitioners' motion for review is denied, and the decision of the special master is affirmed.

## FACTS

Jonathan was born on June 11, 1985, to petitioners Brenda Reusser and Kenneth Reusser. The pregnancy was complicated by spotting in the first trimester and leakage of fluid later in the pregnancy. Although he was slightly jaundiced, Jonathan appeared otherwise healthy at birth, with an official birth weight of seven pounds, fifteen ounces, and APGAR scores of eight and nine.[1]

According to Mrs. Reusser, Jonathan behaved like a perfectly normal baby for the first two months of his life. Mrs. Reusser testified that Jonathan could move about in his crib, lift his legs off the floor, and lift his head up and hold it at midline. Medical records dated June 30, 1986, contain a history that Jonathan "was not an extremely good feeder from the beginning," but to the contrary, Mrs. Reusser testified that Jonathan nursed on demand at regular intervals without any difficulty.

On August 12, 1985, Mrs. Reusser took Jonathan to the office of his pediatrician, Doctor Climaco, in Rock Springs, Wyoming, for his two-month checkup. At the beginning of this visit, Doctor Climaco put Jonathan through a battery of routine motor tests, one of which involved pulling Jonathan from a prone position into a sitting position. Doctor Climaco made a notation in Jonathan's chart that contained the words "head control" followed by plus and minus signs. In a written response to a request by the special master for a clarification of the meaning of the notation, Doctor Climaco explained:

> [M]y note reflects that I questioned his head control with a plus, minus marks. [sic] Whether there was head lag, poor head stability when on prone position or just "not right" and proper head control for his age (8 weeks), I noted head control with plus, minus signs. These signs are to caution myself to follow up this aspect of his development. If totally healthy at that point, a mere "ess. healthy" would have been entered.

During the office visit, Jonathan received his first DPT shot at 2:00 or 2:30 p.m. In accordance with the nurse's instructions, Mrs. Reusser took Jonathan home and gave him Tylenol.

Mrs. Reusser testified that 45 minutes to an hour after Jonathan received the DPT shot, he began crying. According to Mrs. Reusser, Jonathan's crying "progressed to

---

**1.** An APGAR test measures heart rate, respiration, muscle tone, responsiveness to stimulation, and skin color. Two tests are usually performed at exactly one and five minutes after birth. The maximum score is ten. J.E. SCHMIDT, M.D., SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, vol. 1 at A–327 (1993); JOHN H. MENKES, TEXTBOOK OF CHILD NEUROLOGY 299 (4th ed.1990).

a screaming kind of cry" and he developed a fever of over 104 degrees. Jonathan's leg felt hot and was swollen from his knee to his buttocks. Mrs. Reusser testified that she called the emergency room nurse after business hours because she could not reach Doctor Climaco. The nurse assured Mrs. Reusser that it was common for babies to react that way after their first DPT vaccination and that it was nothing to worry about. She instructed Mrs. Reusser to put a cool compress on Jonathan's leg and to continue to give him Tylenol. Mrs. Reusser testified that she followed the nurse's instructions, but to no avail. Jonathan's screaming did not subside and the fever did not come down. Mrs. Reusser's sister, Debra Tamosauskas, came over to help. Mrs. Reusser testified that they sponged Jonathan in a tepid bath at around 6:30 or 7:00 that evening, and that subsequently, Jonathan's temperature came down to approximately 101 degrees. Mrs. Reusser testified that Jonathan did not stop crying until around midnight, when he finally fell asleep.

Mrs. Reusser woke Jonathan the morning of August 13 because he had missed both his bedtime feeding and midnight feeding. Mrs. Reusser testified that Jonathan drained only one breast during this feeding, and she attributed this to the fact that she was so full of milk. According to Mrs. Reusser, Jonathan slept most of the day and was "very irritable when he was awake." Mrs. Reusser described Jonathan's condition that day as "hypotonic" and "limp." Jonathan did not wake up on his own to feed, so every two to four hours Mrs. Reusser woke Jonathan to nurse him. Mrs. Reusser recalls that Jonathan seemed to have difficulty coordinating his breathing with his nursing. He would fall asleep after the feedings, and sometimes even during the feedings. At the time, Mrs. Reusser believed this was because he was worn out from crying all day the day before. That night, Jonathan woke up every one or two hours. Mrs. Reusser testified that he wouldn't feed and that he was "grumpy and agitated and fussy." [2]

Mrs. Reusser testified that in the days that followed, Jonathan did not seem like himself. His sleeping problems and irritability persisted, and he "seemed weak and unwell." In addition, Mrs. Reusser testified that Jonathan's breathing pattern was different and that he no longer moved around in his crib. According to Mrs. Reusser, Jonathan had lost the ability to raise his head for any length of time when he was lying on his stomach.

About ten days or two weeks after Jonathan received his first shot, Mrs. Reusser called Doctor Climaco's office and told the receptionist that she would like Doctor Climaco to take a look at Jonathan because he did not seem to be bouncing back from his DPT shot. Mrs. Reusser testified that the nurse called her back and assured her that Jonathan probably just had a virus and that his condition was unrelated to the shot.

On September 11, 1985, when Jonathan was three months old, Mrs. Reusser took him back to Doctor Climaco's office. Jonathan received his second DPT shot during this visit. According to Mrs. Reusser, by this time Jonathan had lost all control of his head. Mrs. Reusser testified that when Doctor Climaco pulled Jonathan up into a sitting position, his head "just hung backwards the whole time." Doctor Climaco's notes from this visit indicate, "head control—poor." Doctor Climaco assured Mrs. Reusser that Jonathan simply had weak neck muscles, and suggested some neck exercises to perform with Jonathan. Doctor Climaco informed Mrs. Reusser that Jonathan's breathing patterns were normal and advised her to give Jonathan Mylicon for colic.

Mrs. Reusser testified that after the second DPT shot, Jonathan got a fever of around 102 or 103 degrees and cried until approximately 10:00 that night. According to Mrs. Reusser, "the crying continued to the point where it was [a] very aggressive, screaming type cry again." Mrs. Reusser explained that Jonathan's behavior this time "didn't seem to be as intensely violent as the first time." His fever came and

---

**2.** Jonathan's disruptful sleeping pattern persist-   ed until he was approximately four years old.

went throughout the night and eventually subsided by late afternoon the next day. Mrs. Reusser testified that the day after the second vaccination, Jonathan began to lose his ability to suckle and was very lethargic and irritable.

Mrs. Reusser testified that after the second DPT shot, Jonathan "had no head control at all" and was "very, very limp." Mrs. Reusser recalled that Jonathan could no longer lift his legs up off the floor. She testified that Jonathan's body shape was "no longer even the same as it was." According to Mrs. Reusser, Jonathan's chest "became very caved in" and his ribs on the side "would flare out." He began having difficulty with bowel movements the day after the second DPT shot, and it became necessary to administer glycerin suppositories to facilitate a bowel movement until Jonathan reached the age of nine or ten months.

Jonathan visited Doctor Climaco for his six-month checkup in December 1985. At that time, Doctor Climaco noted in his records that Jonathan was floppy and myotonic with poor head control and that he was unable to roll over or stand up. Doctor Climaco referred Jonathan to Dr. Fred Ziter, a neurologist at the University of Utah.

Jonathan was hospitalized at the University of Utah Medical Center on January 5, 1986, for evaluation. The medical history taken during that hospitalization recites that Jonathan was first noted to have poor head control, decreased movement, and delayed development at two and one-half months of age and that Jonathan experienced a high fever after the second DPT shot. Another medical record from the same evaluation states that Jonathan's muscle weakness and hypotonia "[a]ppears to have been present nearly since birth."

In June of 1986, Jonathan was examined by Dr. Joel Thompson, a pediatric neurologist. In a letter to Doctor Climaco, Doctor Thompson wrote the following:

As you know, Jonathan is a one year old child who first became a source of concern to his family at approximately one to two months of age at which time they noted that he could not lift his head off a surface he was lying on.

In the fall of 1986, Jonathan visited Doctor Boardman, a pediatrician. The medical history recorded during this visit contains the following notation regarding Jonathan's second DPT vaccination:

Immuniz: 3 DPT & OPV.

? reaction to 2nd one.

Between the fall of 1986 and the spring of 1989, Jonathan was evaluated by several other specialists. The various medical histories compiled during these visits are unilluminating. Some of the medical histories fix the onset of Jonathan's hypotonia at or near birth, while others recite that Jonathan's problems first became apparent at anywhere from two to six months of age.

Jonathan was evaluated by his current pediatric neurologist, Dr. Robert Zeller, on April 11, 1989. The medical history taken during the initial consultation contains the following observations:

Jonathan is a 3–½ year old male who reportely [sic] has been hypotonic since birth. Mother reports that he seemed to be less active in utero, as her pregnancy went on. She felt he was normally active at about 5 months up to maybe 6 months gestation or so but then became less and less active and comments that she only knew he was alive because he would occasionally have hiccoughs. He had very little kicking or arm movement. At birth he was * * * hypotonic according to mother, although examiners did not report that. * * *

Apgar scores were 8 and 9, although mother thinks the child was having more problems than the apgar score would reflect. * * * His immunizations are up to date without any serious reactions.

Jonathan was re-evaluated for physical therapy on August 22, 1991, approximately one year after the filing of the petition in this case. In contrast to the medical history taken by Doctor Zeller in April, 1989 (over a year prior to the filing of the petition), the background information recorded by the physical therapist in August, 1991,

directly linked the onset of Jonathan's condition with the DPT immunization:

> Jonathan is a 6 year old boy diagnosed with Athetoid Cerebral Palsy of unknown etiology. Mother reported abnormal muscle tone and movements did not appear until about 3 months of age, following Jonathan's DPT immunization.

Today, Jonathan lives with his family in Texas and suffers from cerebral palsy. He is unable to sit up alone, walk, control his head, or feed himself. Jonathan has undergone several diagnostic tests to ascertain the etiology of his condition. Most diseases that have been considered have been ruled out, and to date there has not been a definitive diagnosis for Jonathan's cerebral palsy.

Petitioners filed a petition for compensation under the Vaccine Act, pursuant to 42 U.S.C.A. §§ 300aa-1 *et seq.* (West 1991), alleging that Jonathan suffered a static encephalopathy within the Table period after each of his DPT vaccinations. The petition was referred to a special master for decision, *see* 42 U.S.C.A. § 300aa-12(d)(1), and a hearing was held in Washington, D.C., on January 30, 1992.

At the hearing, the petitioners presented evidence, including medical records, affidavits, the testimony of several fact witnesses, and the expert testimony of Doctor Kinsbourne, a child neurologist. The respondent contested the Reussers' entitlement to an award of compensation under the Vaccine Act and offered testimony from its own expert witness, Doctor Pollack. The petitioners' experts disagreed with the respondent's experts about the existence of a Table injury and the cause of Jonathan's motor impairments.

Doctor Kinsbourne testified that, in his opinion, Jonathan suffered an encephalopathy within 72 hours of his first DPT vaccination. Doctor Kinsbourne based his opinion on Mrs. Reusser's testimony regarding Jonathan's limpness, loss of head control, and difficulty with breathing following the first DPT vaccination. In response to a question on cross-examination, Doctor Kinsbourne testified that he was unable to quantify the likelihood that the cause of a cerebral palsy case would be isolated, but he admitted that some patients remain undiagnosed after years of investigation.

Doctor Pollack, on the other hand, believed to a reasonable degree of medical certainty that Jonathan did not experience an encephalopathy within 72 hours of his first DPT vaccination. In forming his opinion, Doctor Pollack relied on the evidence in the record that Jonathan's hypotonia predated his first DPT immunization. In particular, Doctor Pollack referred to Doctor Climaco's notes of August 12, 1985, questioning Jonathan's head control, Doctor Zeller's notation that Jonathan had been hypotonic since birth, and two other medical records indicating that Jonathan was hypotonic or floppy in the newborn period.[3] Doctor Pollack added that, according to a study by the National Institutes of Health called the Collaborative Study of Cerebral Palsy and Related Disorders, fully two-thirds of the cases of cerebral palsy are of unknown etiology.

On December 21, 1992, the special master issued a written decision. In the decision, the special master concluded that the petitioners had not proven, by a preponderance of the evidence, that Jonathan had suffered an encephalopathy within three days of either the August 12, 1985, or the September 11, 1985, DPT vaccination. The special master observed, "there were so many discrepancies between the medical records and petitioners' contentions that only the most persuasive testimony could have overcome the inherent contradictions." *Reusser v. Secretary of HHS*, No. 90-1114V, slip op. at 14, 1992 WL 397558 (Ct.Fed.Cl.Spec.Mstr. Dec. 21, 1992) (hereinafter "Decision"). The special master concluded that it was more probable than not that Jonathan had an underlying neurological disorder, which predated his first DPT vaccination on August 12, 1985. The special master then addressed the issue of significant aggravation with respect to the second DPT vaccination of September 11, 1985. In doing so, the special master ap-

---

**3.** Doctor Pollack defined the newborn period as the first month of life.

plied what is now commonly referred to as the *Misasi* standard,[4] which involves a comparison of Jonathan's actual condition after the September 11, 1985, DPT vaccination with Jonathan's predicted condition had he never received the DPT vaccination. Based in part on the results of this analysis, the special master concluded that there was not a preponderance of the evidence that the DPT vaccination administered to Jonathan on September 11, 1985, significantly aggravated his underlying neurological disorder.

In a motion for review filed on January 21, 1993, petitioners object to several parts of the special master's decision. Petitioners' objections can be distilled into three main arguments. First, petitioners argue that in requiring "thoroughly credible and persuasive testimony" to overcome the medical records, the special master applied an erroneously high standard of proof to petitioners. Second, petitioners maintain that with respect to the issue of significant aggravation after the second DPT vaccination, the special master erred in placing on petitioners the burden of showing what Jonathan's condition would have been had he not been injured by the DPT vaccine and of comparing that hypothetical condition with Jonathan's present condition. Finally, petitioners maintain that the special master erred in failing to address the issue of significant aggravation with respect to the first DPT vaccination.

The respondent in defense replies that the special master's assignment of greater evidentiary weight to the medical records than to the testimony of the petitioners was proper and did not amount to a heightening of petitioner's burden of proof. Second, respondent argues that whether the special master properly applied the *Misasi* test is of no moment. Respondent maintains that regardless of the analysis employed, the petitioners are not entitled to compensation because they were unable to make a preliminary showing that Jonathan's condition seriously deteriorated within the requisite three-day timeframe. Finally, respondent argues that the special

master was not required to analyze the issue of significant aggravation after the first vaccination because petitioners only alleged significant aggravation after the second vaccination.

## DISCUSSION

### 1. *Standard of Review*

■ In reviewing a decision by a special master, the United States Court of Federal Claims is authorized to "set aside any findings of fact or conclusion[s] of law of the special master found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and issue its own findings of fact and conclusions of law * * *." 42 U.S.C.A. § 300aa–12(e)(2)(B) (West 1991). The issue of whether the evidence of record warrants a conclusion that a vaccine caused an injury calls for review under the arbitrary and capricious standard. *Hines v. Secretary of HHS*, 940 F.2d 1518, 1527 (Fed.Cir.1991). According to the Federal Circuit, " 'arbitrary and capricious' is a highly deferential standard of review." *Id.* at 1528.

■ The Supreme Court, in the context of reviewing a federal agency's decision under the Administrative Procedure Act, 5 U.S.C. § 706 (1988), explained that under the arbitrary and capricious standard, a reviewing court must consider "whether the [federal agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). The scope of review is a narrow one, and the Court is not to substitute its judgment for that of the decision maker. *Id.* at 416, 91 S.Ct. at 823; *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). As the Federal Circuit has recognized, the "touchstone" of arbitrary, capricious, and abuse of discretion standard of review is rationality—consideration of all relevant factors absent a clear error of judgment. *Hyundai Elecs.*

**4.** *See Misasi v. Secretary of HHS*, 23 Cl.Ct. 322     (1991).

*Indus. v. ITC*, 899 F.2d 1204, 1209 (Fed.Cir. 1990). In *Hines*, the Federal Circuit charted the course for a special master's decision under the arbitrary and capricious standard: it must (1) consider the relevant evidence in the record as a whole; (2) draw plausible inferences from the evidence; and (3) articulate a basis for decision that is rational. *Hines*, 940 F.2d at 1528.

2. *Existence of a Table Injury*

▊▊▊▊ Under the Vaccine Act, a petitioner seeking compensation for a vaccine-related injury or death may establish entitlement to compensation by one of two means. First, a petitioner may recover by proving, by a preponderance of the evidence, the existence of a Table injury. This requires proof that the petitioner sustained or significantly aggravated an injury listed on the Vaccine Injury Table, 42 U.S.C.A. § 300aa–14(a) (West 1991), and that the onset or significant aggravation of the injury occurred within the time period prescribed by the Table. *Hines v. Secretary of HHS*, 940 F.2d 1518, 1524 (Fed.Cir. 1991); 42 U.S.C.A. § 300aa–11(c)(1)(C)(i). In the case of a Table injury, causation is presumed. *Hines*, 940 F.2d at 1524. Second, for injuries not listed on the Table, or injuries which occur outside the time period set forth in the Table, a petitioner may recover only by proving by a preponderance of the evidence that the injury was actually caused by the vaccine. *Id.* at 1524–25; 42 U.S.C.A. § 300aa–11(c)(1)(C)(ii).

Petitioners argue that the special master erroneously assigned them a higher burden of proof than the preponderance of the evidence standard provided for in section 300aa–13(b)(2) of the Vaccine Act. This portion of the Vaccine Act provides the following:

(2) The special master or court may find the first symptom or manifestation of onset or significant aggravation of an injury, disability, illness, condition, or death described in a petition occurred within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period. Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset or significant aggravation of the injury, disability, illness, condition, or death described in the petition did, in fact, occur within the time period described in the Vaccine Injury Table.

42 U.S.C.A. § 300aa–13(b)(2) (West 1991). In particular, the petitioners fault the special master for requiring "thoroughly credible and persuasive testimony" to overcome the evidence in the medical records that Jonathan did not sustain an encephalopathy within 72 hours of either vaccination. As petitioners acknowledge, the special master's analysis is an application of the *"Murphy"* rule, where this Court observed, " '[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.' " *Murphy v. Secretary of HHS*, 23 Cl.Ct. 726, 733 (1991), aff'd, 968 F.2d 1226 (Fed.Cir.1992), *cert. denied*, ── U.S. ──, 113 S.Ct. 463, 121 L.Ed.2d 371 (1992) (quoting *Murphy v. Secretary of HHS*, No. 90–882V, slip op. at 6 (Cl.Ct.Spec.Mstr. Mar. 11, 1991)).

▊▊▊▊ Contrary to petitioners' assertion, this Court believes that the *"Murphy"* rule is consistent with the strictures of section 300aa–13(b)(2) of the Vaccine Act. The rule is a reflection of the appropriate weight to be accorded conflicting evidence; it in no way alters petitioners' burden of proof. *See, e.g., Cucuras v. Secretary of HHS*, 26 Cl.Ct. 537, 542 (1992) (special master's assignment of greater evidentiary weight to medical records than to petitioners' testimony did not create a presumption against their veracity nor increase their burden of persuasion), aff'd, 993 F.2d 1525 (Fed.Cir.1993). The *"Murphy"* rule embodies the widely held belief that written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later. With or without the *"Murphy"* rule, the petitioners' burden of proof remains the same: they must prove by a

preponderance of the evidence that the onset or significant aggravation of the injury described in the petition occurred within the requisite time period described in the Vaccine Injury Table.

Petitioners also make the argument that the special master erred in finding the presence of a pre-existing condition. The Court finds this argument somewhat anomalous. Elsewhere in the petitioners' memorandum of objections, the petitioners argue that the special master erred in failing to find a significant aggravation of Jonathan's condition after the first or second vaccination. Obviously, in order to make such a finding, the special master would have to first conclude that there was a pre-existing condition to be aggravated. For the sake of analysis, however, this Court will address the related issue of whether the special master's finding that Jonathan had a pre-existing condition biased her evaluation of the petitioners' claim that the onset of Jonathan's condition occurred within 72 hours of vaccination.

The factors that a special master is required to consider in determining whether a Table injury occurred are listed in the Vaccine Act. The section of qualifications and aids to interpretation, 42 U.S.C.A. § 300aa–14(b)(3)(A), defines encephalopathy as "any significant acquired abnormality of, or injury to, or impairment of function of the brain" and states:

> Among the frequent manifestations of encephalopathy are focal and diffuse neurologic signs, increased intracranial pressure, or changes lasting at least 6 hours in level of consciousness, with or without convulsions. The neurological signs and symptoms of encephalopathy may be temporary with complete recovery, or may result in various degrees of permanent impairment. Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable [sic] crying, and bulging fontanel are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy. Encephalopathy usually can be documented by slow wave activity on an electroencephalogram.

Petitioners presented lay testimony that Jonathan exhibited some symptoms that were compatible with an encephalopathy within three days of both the first and the second DPT vaccination. Mrs. Reusser testified to relentless crying, high fever, prolonged sleeping, frequent wake ups, difficulty nursing, erratic breathing patterns, flaccid muscle tone, limpness, and loss of head control within three days of the first DPT shot. In addition, Mrs. Reusser's sister, Debra Tamosauskas, testified that the day after the first DPT shot, Jonathan's eyes were dull and he never seemed to wake up. Mrs. Reusser also testified that within three days of the second DPT shot, Jonathan again developed a fever, cried constantly, woke frequently, became constipated, lost his ability to suck, became extremely limp, and had no head control at all.

The petitioners' medical expert, Doctor Kinsbourne, testified that in his opinion, Jonathan suffered an encephalopathy within 72 hours of his first DPT vaccination. Doctor Kinsbourne acknowledged that he based his opinion on Mrs. Reusser's testimony of Jonathan's limpness, loss of head control and difficulty breathing, and that he could not reach the same conclusion on the basis of the medical records alone.

The respondent's expert, Doctor Pollack, testified that it was his belief to a reasonable degree of medical certainty that Jonathan did not suffer an encephalopathy within three days of the first DPT vaccination. Doctor Pollack explained that his opinion was based upon the clear evidence in the medical records that Jonathan had hypotonia which predated his immunization. This evidence consisted of Doctor Climaco's contemporaneous notation questioning head control immediately prior to the first immunization, medical histories recorded by two other physicians stating that Jonathan was hypotonic from the newborn period and Doctor Hood's evaluation stating that Jonathan was floppy in the newborn period with a poor suck. In addition, Doctor Zeller's medical history specifically stated that there was diminished fetal activity during

pregnancy, and that Jonathan had been hypotonic since birth.

The special master ultimately concluded that the petitioners had failed to prove, by a preponderance of the evidence, that Jonathan had sustained an encephalopathy within 72 hours of either DPT shot. In reaching this conclusion, the special master was clearly troubled that the witness' recollection of events were not substantiated by the numerous detailed medical records, several of which suggested that Jonathan had hypotonia before the administration of the first DPT vaccination. In this regard, the special master explained,

> Doctor Kinsbourne based his conclusions regarding Jonathan's encephalopathy on histories not contained in any contemporaneous medical records. Indeed, there is nothing in the medical records (prior to 1991, after the petition was filed herein) which confirms any serious reaction to any of Jonathan's immunizations. * * * While a fever and questionable reaction to the second vaccination are alluded to in the medical records, no mention is made of any symptoms following the first vaccination. This is troubling as Mrs. Reusser testified that Jonathan's temperature did not rise as high after the second vaccination as it did after the first, nor was his reaction as violent. Moreover, while Doctor Kinsbourne relied on Jonathan's loss of muscular control after the first vaccination to form his opinion in this matter, there are numerous records which indicate Jonathan's hypotonia predated his first DPT vaccination.

Decision at 12 (emphasis in original).

■ Petitioners argue that the special master erred in finding the presence of a pre-existing condition when both petitioners' and respondent's medical experts testified that they could draw no such conclusion. It is true that the special master is not a medical expert. As petitioners correctly point out, she may rely upon the opinions of medical experts who testify before her, but she cannot create her own expert opinion. *See Bunting v. Secretary of HHS*, 931 F.2d 867, 872–73 (Fed.Cir.

1991). Upon careful review of the record, however, this Court disagrees with petitioners' assertion that there was no basis in the experts' opinions to support the special master's finding that the onset of Jonathan's condition occurred prior to the administration of the first DPT vaccination. Dr. Pollack testified quite emphatically that he believed that Jonathan's condition antedated his first DPT immunization. The relevant part of Dr. Pollack's testimony was as follows:

Q  Do you believe, Dr. Pollack, that Jonathan Reusser suffered an encephalopathy within three days of the receipt of his first DPT vaccine?

A  I do not.

Q  You hold that opinion, I assume, to a reasonable degree of medical certainty?

A  Yes, I do.

Q  Could you—let's talk about the opinion for the Court. What is the basis for that opinion?

A  Well, I think that there are several items in the records which were provided that support my interpretation. Firstly, I think that there is clear evidence in the medical records that the patient had hypotonia which antedated his immunization. Included in that I would list Dr. Climaco's note on the day of the patient's immunization, that is prior to receiving the first immunization, that the head control is plus-minus.

In addition, there are notes by two other physicians which indicate that then [sic] they obtain their history from the mother or the individual who accompanied the patient to their office, that there was a report of hypotonia from the newborn period. Dr. Zeller's note specifically states that the patient had been hypotonic since birth and that there was diminished fetal activity since pregnancy.

Dr. Hood states in his evaluation that the patient was floppy in the newborn period with a poor suck. So I think that there are three indicators in the record that this patient's condition antedated immunization.

Transcript of Hearing, *Reusser v. Secretary of HHS*, No. 90–1114V at 125–26 (Ct. Fed.Cl.Spec.Mstr. Dec. 21, 1992) (hereinafter "Transcript").

■ It should also be noted that the special master was not required to make any finding regarding the presence or absence of a pre-existing condition. Based on the lack of corroboration in the contemporaneous medical records, the special master concluded that the petitioners had failed to establish that the onset of Jonathan's condition occurred within three days of either vaccination. The special master could have left the analysis at that. She was not required to then determine when, more likely than not, the evidence did establish the onset of Jonathan's condition. Upon review of the entire record, this Court is unable to conclude that the special master's finding of a pre-existing condition was arbitrary, capricious, or an abuse of discretion. Moreover, the Court does not believe that the special master's finding in this regard in any way tainted her evaluation of the petitioners' claim that the onset of Jonathan's condition occurred within three days of receipt of the DPT vaccination.

## 3. *Significant Aggravation of a Pre-Existing Condition*

■ Section 300aa–11(c) of the Vaccine Act provides for recovery of compensation if an individual "sustained or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table" and if the first onset or significant aggravation occurred within the statutory time period set forth in the Table. A significant aggravation is defined by the Vaccine Act as "any change for the worse in a preexisting condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." 42 U.S.C.A. § 300aa–33(4) (West 1991). The legislative history of the Vaccine Act provides additional guidance in determining the types of injuries that are compensable under a theory of significant aggravation:

> The Committee has included significant aggravation in the Table in order not to exclude serious cases of illness because of possible minor events in the person's past medical history. This provision does not include compensation for conditions which might legitimately be described as pre-existing (e.g., a child with monthly seizures who, after vaccination, has seizures every three and a half weeks), but is meant to encompass serious deterioration (e.g. a child with monthly seizures who, after vaccination, has seizures on a daily basis). The Committee also intends that the time periods set forth in the Table apply to the significant aggravation in order for causation to be deemed to exist (e.g., a significant deterioration of a seizure disorder after DPT vaccination must first become manifest within three days of the vaccination).

H.R.Rep. 908, 99th Cong., 2nd Sess., pt. 1 at 15–16, *reprinted in* 1986 U.S.C.C.A.N. 6287, 6344, 6356–57. Section 300aa–13(b)(2) of the Vaccine Act establishes that the 72 hour timeframe contained in section 300aa–14(a) for injuries of this type also applies to significant aggravation.

In *Misasi v. Secretary of HHS*, 23 Cl.Ct. 322 (1991), this Court set forth a four-pronged test to determine whether an individual experienced a significant aggravation of a pre-existing condition. The *Misasi* test requires the trier of fact to:

> (1) assess the individual's condition prior to administration of the vaccine, *i.e.*, evaluate the nature and extent of the individual's preexisting condition, (2) assess the individual's current condition after the administration of the vaccine, (3) predict the individual's condition had the vaccine not been administered, and (4) compare the individual's current condition with the predicted condition had the vaccine not been administered.

*Id.*, 23 Cl.Ct. at 324. Under the *Misasi* test, a petitioner may prevail if he or she demonstrates by a preponderance of the evidence that the individual's actual condition constitutes a significant aggravation of the individual's predicted condition had the vaccine not been administered. *Id.*

Petitioners contend that the special master erred in placing on them the burden of

proving prongs three and four of the *Misasi* test. Specifically, petitioners maintain that in proving a case of significant aggravation, it is not their burden to show what Jonathan's condition would have been had he not been injured by the DPT vaccine or to compare that hypothetical condition with Jonathan's present condition. According to petitioners, their burden of proof, as set forth in section 300aa–13(a)(1)(A), is merely to prove by a preponderance of the evidence the matters discussed in section 300aa–11(c)(1). In petitioners' case, this would entail proving that (1) Jonathan's neurological condition was significantly aggravated, and that (2) the aggravation occurred within 72 hours of either vaccine.

Admittedly, the *Misasi* test has been subjected to criticism, and recent caselaw has modified some aspects of the test. Two decisions from this Court are deserving of special consideration. In *O'Connor v. Secretary of HHS*, 24 Cl.Ct. 428 (1991), *aff'd*, 975 F.2d 868 (Fed.Cir.1992), the Court clarified that *Misasi* does not alter petitioners' initial burden of proof. In this regard, the Court explained:

As a matter of clarification, this court notes that the *Misasi* standard should not be construed as altering the petitioners' initial burden when demonstrating presumed causation under § 300aa–13(a)(1)(A). In making a *prima facie* showing of presumed causation, petitioners need not prove causation or disprove possible alternative causes for the deterioration in the child's preexisting condition following the vaccination. *See McClendon v. Secretary of HHS*, 24 Cl. Ct. 329, 334 (Cl.Ct.1991). The *Misasi* standard is implicated only after the respondent has met its burden under section 300aa–13(a)(1)(B) of showing an actual alternative cause, *i.e.*, the natural progression of the preexisting condition rather than the vaccination. *See McClendon*, 24 Cl.Ct. at 333–334. The burden then necessarily shifts to petitioners to rebut by demonstrating causation or by discrediting the respondent's evidence. *See Johnson v. Secretary of HHS*, No. 89–62V, 1990 WL 320233 [at

*3], 1990 U.S.Cl.Ct. LEXIS 259, at *6 (Cl.Ct.Spec.Mstr. June 22, 1990).

*O'Connor*, 24 Cl.Ct. at 429–30 n. 2. The Court in *Schumacher v. Secretary of HHS*, 26 Cl.Ct. 1033 (1992), cited the burden of proof analysis in *O'Connor* with approval and went on to recognize the impropriety of applying the *Misasi* test rigidly in all cases. In this vein, the Court observed,

[T]here is nothing in the Vaccine Act or its legislative history that mandates the application of the *Misasi* analysis in claims alleging significant aggravation. *Misasi* is a judicially-created test which attempts to facilitate the analysis of significant aggravation cases by articulating a standard by which all such cases are decided. However, given the applicable statutory criteria, it is not possible to apply the analysis rigidly in all cases. The mere fact that a petitioner fails to satisfy all four prongs of the *Misasi* test does not *per se* indicate that no significant aggravation occurred in a particular case.

*Schumacher*, 26 Cl.Ct. at 1042.

This Court agrees with these analyses of the *Misasi* test set forth in *O'Connor* and *Schumacher*. The *Misasi* test, as modified in those cases, does not alter the petitioner's initial burden of proof as set forth in section 300aa–13(a)(1)(A). With respect to Table cases, the petitioners' burden under section 300aa–13(a)(1)(A) is to prove, by a preponderance of the evidence, that the claimant sustained or significantly aggravated an injury listed on the Vaccine Injury Table and that the onset or significant aggravation of the injury occurred within the time period prescribed by the Table. *See Hines*, 940 F.2d at 1524–25. If the petitioner succeeds, the burden then shifts to the respondent to rebut the petitioner's showing by proving, by a preponderance of the evidence, that the condition is due to factors unrelated to the administration of the vaccine. 42 U.S.C.A. § 300aa–13(a)(1)(B); *McClendon v. Secretary of HHS*, 24 Cl.Ct. 329, 334 (1991); *Matthews v. Secretary of HHS*, 18 Cl.Ct. 514, 518–19 (1989). "Thus, while the petitioners may justifiably point to the absence of alternative causes for the purpose of proving either presumed or ac-

tual causation in their own case-in-chief, * * * *it is not* the petitioners' burden to disprove all possible alternative causes in order to prevail." *McClendon*, 24 Cl.Ct. at 333–34 (italics in original) (citing *Bunting v. Secretary of HHS*, 931 F.2d 867, 872–73 (Fed.Cir.1991)). It is for this reason that the *Misasi* test, which essentially involves proving that the cause of the injury sustained is *not* due to a pre-existing condition, is an inappropriate test to evaluate whether a petitioner has succeeded in proving a *prima facie* case under section 300aa–13(a)(1)(A). The *Misasi* test is better applied to those significant aggravation cases where the petitioner successfully makes a showing of presumed causation under section 300aa–13(a)(1)(A) and the respondent successfully rebuts that presumption under section 300aa–13(a)(1)(B) by proving that the injury is instead due to a pre-existing condition. In such a case, the burden then shifts back to petitioners to rebut the respondent's showing by proving actual causation or by discrediting the respondent's evidence. *O'Connor*, 24 Cl.Ct. at 429–30 n. 2. At this point, the *Misasi* test may be used to evaluate the petitioner's position.

In the present case, the special master determined that the petitioners had failed to meet their initial burden of proving that Jonathan's condition seriously deteriorated within 72 hours of his second DPT vaccination on September 11, 1985. As the special master recognized, it was not necessary to address the issue of alternative causes because petitioners failed to prove that Jonathan suffered an encephalopathy within the Table period. Such being the case, the special master need not have gone any further. Nonetheless, the special master proceeded to evaluate the petitioner's claim of significant aggravation using the *Misasi* analysis. The petitioner's argument that the special master incorrectly applied the *Misasi* test is irrelevant. Having failed to prove a *prima facie* case under section 300aa–13(a)(1)(A), the petitioners could not prevail, regardless of the analysis employed.

Next, petitioners argue that the special master erred in failing to address the issue of significant aggravation after the first DPT shot. The special master's entire discussion of significant aggravation concerned Jonathan's condition before and after the second DPT shot. The petitioners contend that the special master applied the analysis to the wrong shot.

The problem with petitioners' argument is that petitioners never alleged significant aggravation after the first vaccination. For that matter, petitioners did not allege significant aggravation after either DPT vaccination. The issue was not raised in petitioners' complaint, prehearing memorandum, or opening statement. Petitioners' entire presentation of evidence on the issue of significant aggravation consisted of the following colloquy on redirect of Dr. Kinsbourne:

Q To follow-up on what Ms. Mason just questioned you about, Doctor, if you take as a given that what Dr. Climaco was relating in the child's first visit at the first DPT shot, if that was definitely head lag, poor head control, etc., instead of just this question that we have sitting here, take that as a given. The condition at the next visit where the child received his second DPT shot one month later, the notations that are there and Dr. Climaco's explanation of the child's condition, would you say that that child's condition significantly deteriorated?

A Oh, obviously so. Now, we have far more than head lag to contend with. That is why I was saying earlier that if the head lag were the case before then I would consider the question of an aggravation.[5]

5. Dr. Kinsbourne had earlier mentioned significant aggravation on cross-examination in the following context:

"Q Okay. Dr. Kinsbourne, I'd like you to assume that there was head lag prior to the administration of the first DPT vaccine. Would that change your opinion?

"A Well, it would certainly change my position as to the pertussis being the original cause of the encephalopathy which this child experienced. I might however reach an opinion that it aggravated that encephalopathy. I would have to review it then from that prospective [sic]." Transcript at 109–10.

Transcript at 110–11. This testimony amounts to nothing more than conjecture. At most, Dr. Kinsbourne acknowledged that if, hypothetically speaking, Jonathan did have poor head lag prior to the first DPT vaccination, then he would consider the issue of significant aggravation. Dr. Kinsbourne did not testify that Jonathan had poor head control prior to the first DPT shot or that Jonathan's condition was significantly aggravated by the first DPT shot. In short, no factual evidence on the issue of significant aggravation after the first DPT vaccination, or after either vaccination, was presented. Vaccine Rule 8(f) is squarely on point. This provision states:

> Any fact or argument not raised specifically in the record before the special master shall be considered waived and cannot be raised by either party in proceedings on review of a special master's decision.

RCFC, Appendix J, Vaccine Rule 8(f). The special master cannot be faulted for failing to address theories of recovery that were not presented by the parties. Because the petitioners failed to specifically present factual evidence on the issue of significant aggravation after the first DPT vaccination in the record before the special master, the argument is deemed waived.

### CONCLUSION

The Court does not find that the special master's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. She met all the requirements of the Vaccine Act in the standard of proof she required, the factors she considered, and her evaluation of testimony, both lay and expert. Therefore, the petitioners' motion for review is denied, the decision of the special master is affirmed, and the clerk shall enter judgment accordingly.

No costs on review.